**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**LAKIA BEASLEY,** *et al.*,

        Plaintiffs,

        v.

**CARLOS DEL TORO,** *et al.*,

        Defendants.

Case No. 22-cv-667 (CRC)

---

**MEMORANDUM OPINION AND ORDER**

Plaintiffs LaKia Beasley and Richard Henderson were separated from the Navy without

the medical and retirement benefits they claim are owed to them because the Navy failed to

assess whether they incurred or aggravated their conditions in the line of duty—a prerequisite for

benefits under 10 U.S.C. § 1201.  Because they were non-active Reservists at the time of their

separation and did not have a so-called Line of Duty Benefits ("LODB") Letter, the Navy

referred them into a regulatory pathway within the Disability Evaluation System ("DES")

reserved for non-duty related conditions.  Once placed into that pathway, the Navy refused to

consider evidence that their injuries stemmed from their deployments to Afghanistan and cut

them loose empty handed.  Plaintiffs responded by filing the current action under the

Administrative Procedure Act ("APA"), 5 U.S.C. § 500 et seq., contending the Navy's failure to

investigate their eligibility violated applicable regulations requiring it to determine whether a

Service member's medical condition stems from the line of duty and then refer all eligible

members into the duty-related path of the DES for an allocation of benefits.

Beasley and Henderson maintain their stories, while tragic, are far from unique.  In their

telling, the Navy has systematically violated its obligation to investigate whether a Reservist is

eligible for duty-related benefits by treating the lack of an LODB Letter as conclusive evidence

that a Reservist was not injured in the line of duty, even though the Navy has no established policy on how Reservists can obtain these letters prior to referral into the non-duty related path of the DES. They accordingly move to certify a class of 319 Reservists who were separated or are currently pending separation from the Navy through the non-duty related path without a formal finding as to whether their condition arose from their time in active service. If the Court grants the motion, the Class plans to pursue injunctive relief compelling the Navy to determine each class member's eligibility for benefits and to revamp its referral processes to ensure Reservists are evaluated for eligibility for medical retirement or separation going forward.

The Navy, for its part, contends that class certification is inappropriate here because Department of Defense and Navy regulations do not create any procedural right to a line-of-duty determination and thus there is no legal injury common to all class members. Furthermore, even if Plaintiffs could satisfy Federal Rule of Civil Procedure 23's requirements, the Navy contends class certification would still be unnecessary because the Navy has addressed Plaintiffs' concerns about its referral processes by creating an avenue for Reservists wrongly assigned to the non-duty related path to cross over into the duty-related pipeline. But given that this revision will not undo Plaintiffs' allegedly erroneous denial of benefits because they are already separated, the Navy has moved for voluntary remand to the Board for Correction of Naval Records ("BCNR") so it can reassess their eligibility in light of that new policy and, if determined eligible, award benefits.

Having considered the briefing on these two motions and held a hearing on the matter, the Court will (1) grant the Navy's request for voluntary remand, (2) deny Plaintiffs' motion for class certification without prejudice to refiling following remand, and (3) stay this case during the remand period. This resolution will provide Plaintiffs with a chance to receive the benefits

owed to them and offer the parties an opportunity to pursue a negotiated settlement over any unresolved issues with the Navy's DES referral processes.

## I.   Background

### A.   Legal Background

Congress has authorized the Secretaries of the military departments, including the Navy, to provide certain retirement and medical benefits to eligible Service members who are unable to continue their military service because of a disability that "is the proximate result of performing active duty." 10 U.S.C. §§ 1201, 1203. Service members with a so-called "disability rating" of more than 30 percent are potentially eligible for medical retirement, while those with a rating of less than 30 percent may be entitled to medical separation benefits. See id. § 1203(b). Outside of medical ratings, the central determinant of whether a Service member is eligible for disability benefits is whether his or her injury was "incurred in line of duty." Id.

Pursuant to this congressional mandate, see id. § 1216, the Department of Defense has created the DES to assess Service members' fitness for duty and eligibility for medical retirement and separation benefits. Department of Defense Instruction ("DoDI") 1332.18 directs secretaries of the various military departments to "refer Service members who meet the criteria for disability evaluation" into the DES. DoDI 1332.18, App. 1 to Enclosure 3, § 1. This referral is the only way to access the DES, as "Service members cannot self-refer." Torres v. Del Toro, No. 21-cv-306-RCL, 2021 WL 4989451, at *2 (D.D.C. Oct. 27, 2021). When referring Service members, officials make a critical choice that stands at the center of this case: whether to send a member to the *duty-related* pathway of the DES or the *non-duty related* pathway. Members sent to the duty-related pathway first go before the Medical Evaluation Board ("MEB") for medical evaluation and, when appropriate, proceed to the Physical Evaluation Board ("PEB") for a

determination of fitness and eligibility for benefits.  See DoDI 1332.18, Enclosure 3, §§ 1(a), 2(a), 3(a).  Those referred into the non-duty related path, by contrast, "will be referred solely for a fitness for duty determination" and have no prospect of receiving retirement or separation benefits.  Id., App. 1 to Enclosure 3, § 3(b).

DoDI 1332.18 spells out the eligibility requirements for these two pathways for Service members who have satisfied the medical criteria.  See id. § 2 (describing the requisite medical criteria for referral to the DES).  Those presumptively eligible for the duty-related pathway include "Service members on active duty or in the [Reserve Component ('RC')] who are on orders to active duty specifying a period of more than 30 days" as well as "RC members who are not on orders to active duty specifying a period of more than 30 days but who incurred or aggravated a medical condition while the member was ordered to active duty for more than 30 days."  Id. § 3(a)(1), (2).  The Instruction also details certain conditions that disqualify otherwise eligible Service members from referral to the duty-related pathway, including if the "[d]isability results from intentional misconduct or willful neglect."  Id. § 4.  The residual group of Service members who otherwise meet the requisite medical criteria but do not fall within one of these specified categories are placed into the non-duty related pathway, id. § 3(b), designed for Service members with "[c]onditions that were neither incurred nor aggravated while the [Active Component] or RC Service member was performing duty," DoDI 1332.18, Glossary, Part II.

Beyond detailing eligibility requirements, DoDI 1332.18 establishes procedures for determining whether a Service member incurred or aggravated her condition "in line of duty" (in "LOD") and is thus eligible for the duty-related pathway.  It defines an "LOD determination" as "[a]n inquiry to determine whether an injury or illness was incurred when the Service member was in a military duty status," or, "[i]f the Service member was not in a military duty status,

whether it was aggravated by military duty; or whether it was incurred or aggravated due to the Service member's intentional misconduct or willful negligence."  Id.  These LOD determinations ensure that eligible Service members receive appropriate benefits and, conversely, that ineligible members are separated without benefits.  See DoDI 1332.18, App. 3 to Enclosure 3, § 6.  The Instruction further maintains that "[w]hen an LOD determination is required, it will be done before sending a Service member's case to the PEB."  Id. § 6(b).  It then provides a non-exhaustive list of when LOD determinations are necessary.  Id. § 6(d).  But these are the exceptions, rather than the rule.  Many (if not most) cases will not require an individualized LOD investigation because they are controlled by "[p]resumptive [d]eterminations," id. § 6(c), including a presumption that "diseases or injuries incurred by Service members on continuous orders to active duty specifying a period of more than 30 days were incurred or aggravated in the LOD unless the disease or injury was noted at time of entry into service," id. § 7(c)(1).

Particularly relevant here, DoDI 1332.18 does not delve into the details of how military officials should process Reservists entering the DES from non-active status.  It makes clear that non-active Reservists are eligible for benefits for "[a]ny medical conditions incurred or aggravated during one period of active service . . . that recurs, is aggravated, or otherwise causes the member to be unfit . . . provided the origin of such condition or its current state is not due to the Service member's misconduct or willful negligence, or progressed to unfitness as the result of intervening events when the Service member was not in a duty status."  Id. § 7(e).  Yet, beyond that general statement of the eligibility requirements, the Instruction does not explain when a military official or branch must investigate the origins of a Reservist's injury.  This matter thus appears to be one of the many features of the DES that the Department of Defense has left for the military branches to color in the details.  See DoDI 1332.18, Enclosure 2, § 4(b).

The Navy has answered this call by creating its own dual-track DES process for sailors and Marine Corps members.  As with the Department of Defense regulations, the Secretary of Navy Instructions ("SecNavInst") contemplates the use of LOD investigations, see SecNavInst 1770.5, Enclosure 1, § 11(a), as well as the use of presumptions in lieu of an investigation, see SecNav M-1850.1, Ch. 3, § 6, to funnel Service members into these two pathways.  The main issue in this case is the processes for referring Reservists whose conditions manifest or worsen when they are not on active duty.

The Navy's DES Manual explains that Service members who are eligible for the duty-related pathway include "RC members who are not currently on orders to active duty specifying a period of more than 30 days but who incurred or aggravated a medical condition while the member was previously part of the Active Component (AC) or while ordered to active duty for more than 30 days."  Id., Ch. 2, § 1(b).  Those Reservists advance first to the MEB for a medical determination and then to the PEB for an assessment of whether they are eligible for benefits. See id., Ch. 1, § 2.  However, the only way for a Reservist who is not on active duty for more than 30 days prior to referral into the DES to access the duty-related path is to receive an "LOD Benefits (LODB) Letter."  Id., Ch. 2, § 1 (having an LODB letter "is required" to access the duty-related path).  Reservists "with neither active duty orders for a period longer than 30 days nor an LODB letter" are ineligible for the duty-related path and are instead sent to the Navy's non-duty related Medical Retention Review ("MRR") process.  Id., Ch. 4, § 5(b)(1).  Under this MRR process, Commanding Officers prepare an MRR package, including medical information and a recommendation as to whether the member is fit for service, and submit this package to the Bureau of Medicine and Surgery ("BUMED") for a determination of the individual's physical qualification.  See Navy's Mot. to Remand 5 (citing Navy Reserve Personnel Manual 6000-010

§§ 5(f)(2), 5(f)(6); Bureau of Naval Personnel Instruction 1001.39F, Ch. 2, Enclosure 1,

§ 203(2)(a)).  If the BUMED determines that a Reservist is not physically qualified, she may

either accept the finding and be discharged without benefits or appeal the decision to the PEB.

Id. at 5–6.  The PEB can review only the BUMED's determination of fitness, not whether the

underlying injury arose in the line of duty.  Id. at 6 (citing DoDI 1332.18, App. 1 to Enclosure 3,

§ 3(b)).

An LODB letter is thus the key.  With a letter in hand, a Reservist will proceed through

the DES's duty-related pathway and receive the benefits to which she is entitled upon separation

or retirement.  Without a letter, a Reservist is funneled through the MRR and, if unfit for service,

cut loose without any retirement or separation benefits.  Given the central role that the LODB

letter plays in this scheme, one might imagine the Navy has a well-ordered process for

determining who qualifies for such a letter.  But that is not the case.  Until recently, the Navy had

no standardized policies or practices for doling out these letters.

That changed somewhat in February 2022, when the Navy Personnel Command issued a

new standard operating procedure ("SOP") for sailors who believe they were wrongly referred

into the non-duty related MRR process to seek an LODB letter that will allow them to cross over

into the duty-related DES pipeline.  See id., Ex. A (PERS-95 SOP 6000).  In what can only be

described as an alphabet soup, the Navy termed this new directive the "LODB for DES SOP."

See Navy's Mot. to Remand at 7.  Under the SOP—which the Navy revised and republished in

August 2022—a sailor "may submit a LOD-B for DES package for a potentially unfitting

condition incurred or aggravated during a qualified period of duty" *after* the BUMED has issued

its determination of the sailor's fitness.  See id., Ex. A §§ 3(b), 5(a).  The new SOP provides

sailors with a detailed checklist that they must follow for requesting an LODB letter as well as

instructions for processing those complaints.  But, as noted above, the procedure applies only to sailors who have already been referred into the non-duty related pathway.  It provides no assistance for Reservists seeking an LODB letter before being referred into the DES.  See id. § 4(g) ("IF SAILOR IS <u>NOT</u> ALREADY IN THE MRR PROCESS, DO <u>NOT</u> SUBMIT A MRR PACKAGE FOR LOD-B FOR DES.").  Nor does it provide relief for Reservists who were previously referred into the MRR process with no escape route and separated without benefits.

Reservists who were separated without benefits before the new SOP took effect are not forever bound by that determination, however.  Congress has authorized the Secretaries of the military departments to amend "any military record" whenever "necessary to correct an error or remove an injustice."  10 U.S.C. § 1552(a)(1).  The Secretary of the Navy has exercised this authority by establishing the BCNR "for the purpose of determining the existence of error or injustice in the naval records of current and former members of the Navy and Marine Corps."  32 C.F.R. § 723.2(b).  "Members who have been separated or permanently retired . . . can petition the BCNR for relief."  SecNav M-1850.1, Ch. 4, § 8(a)(1).  The BCNR then reviews all pertinent evidence and determines whether to grant or deny the requested correction of records.  32 C.F.R. § 723.3(e)(1).  An applicant may submit additional evidence not contained in the Navy's records, see id. § 723.4(e)(1), including evidence that her injury was incurred in the line of duty.

B.  <u>Factual and Procedural Background</u>

LaKia Beasley and Richard Henderson are highly decorated former Navy members who were medically separated while serving as non-active Reservists prior to the new SOP.  Compl. ¶¶ 19–20.  Beasley served in the Navy's Active Component from 2006 to 2016.  Id. ¶ 19.  Within months of her final deployment to Afghanistan in 2012 as part of Seal Team Four, two of her close friends were killed in combat and her Commanding Officer died by suicide.  Id. ¶¶ 59–62.

These losses stirred up feelings of anxiety and depression, according to Beasley, which eventually led to chronic migraines, hypervigilance, insomnia, and asthma.  Id. ¶ 64.  Beasley began receiving treatment for post-traumatic stress disorder ("PTSD") and physical disabilities before her Active Component enlistment ended, but her medical struggles allegedly continued once she returned to the United States as a member of the Navy Reserve.  Id. ¶ 65–66.  It was at this point that Beasley's new Commanding Officer referred her into the non-duty related MRR process.  Id. ¶ 67.  Once in the MRR process, the BUMED determined Beasley was unfit for further service without investigating the origins of her conditions.  Id. ¶ 68.  Beasley appealed her separation, asking the PEB to find that her injuries stemmed from her deployment.  The PEB refused this request on the ground that "[i]n adjudicating MRR cases, the PEB can only make a Physically Qualified/Not Physically Qualified (PQ/NPQ) determination and is not authorized to terminate a properly referred case or to render a Line of Duty Determination."  Administrative Record ("AR") at 4.  The fact that Beasley had not received an LODB letter was determinative, Compl. ¶ 71, and she was separated without benefits in May 2021, id. ¶ 76.

Richard Henderson's separation played out along similar lines.  Henderson enlisted in the Navy Reserve in 2005 and rose through the ranks to become a First Class Petty Officer.  Id. ¶ 20.  He was ordered to active duty and deployed to Afghanistan in 2014, where his base came under rocket fire.  Id.  While running for cover, Henderson fell into a deep concrete ditch and injured his neck, back, right knee, and shoulder.  Id. ¶ 81.  He was evacuated one month later to receive treatment in Germany before returning to the United States where he underwent surgeries on his knee and shoulder while on "MEDHOLD," id. ¶¶ 82–84, a program "with the sole purpose of addressing medical conditions incurred or aggravated while in the line of duty," SecNavInst 1770.5, Enclosure 2, § 1.  Once his active-duty orders ended in 2015, Henderson's chain of

command launched an investigation into whether his ongoing injuries were incurred or aggravated in the line of duty.  Compl. ¶ 86.  For some unknown reason, however, Henderson says he never received an LODB letter.  Id.  As a result, after his conditions progressively deteriorated over the next few years, the Navy referred Henderson into the MRR process.  Id. ¶¶ 87–88.  The BUMED declared Henderson physically unqualified for further service without any determination of the origins of his injuries.  Id. ¶ 89.  Henderson then appealed his determination to the PEB.  Id. ¶¶ 90–92.  As in Beasley's case, however, the PEB refused to consider evidence that Henderson's condition was the result of his deployment and treated the absence of an LODB letter as conclusive proof that he was not injured in the line of duty.  Id. Henderson was accordingly separated without medical retirement or separation benefits in November 2020.  Id. ¶ 94.

In early 2022, Beasley and Henderson filed a class action on behalf of themselves and other Navy and Marine Corps Reserves who were separated from the military through the MRR process without an LODB letter or any assessment of whether their injury was incurred in the line of duty.  Id. ¶¶ 96–97.  Their complaint asserted three causes of action under the APA based on the allegations that the Navy did not evaluate their eligibility for disability benefits or medical retirement prior to their separations as required under the applicable Department of Defense and Navy regulations outlined above.  See id. ¶¶ 106–27.  Plaintiffs sought an order setting aside their separations and directing the Navy to assess their LOD status and, if found eligible, award benefits.  Id. ¶ 129.  Additionally, Plaintiffs requested programmatic relief in the form of an injunction requiring the Navy to "implement procedures" to ensure that Navy and Marine Corps Reservists are evaluated for eligibility for medical retirement or separation going forward.  Id. ¶ 129(g)–(h).

At the time they filed the complaint, Plaintiffs claim they were unaware that the Navy had rolled out its new SOP one month earlier.  <u>See</u> Opp'n to Remand at 6.  Plaintiffs say they first learned of that new policy during a meet-and-confer in October 2022, <u>id.</u>, when the Navy first "proposed voluntary remand and informed Plaintiffs that Defendants intended to move for voluntary remand if Plaintiffs did not agree to it," Navy's Reply, Ex. A ¶ 8.  After Plaintiffs refused this offer, the sides proceeded with two sets of motions: one for class certification and another for voluntary remand.

The parties filed their dualling motions on the same day.  The Navy's motion asserts that the new SOP already supplies the systemic relief Plaintiffs seek and requests "voluntary remand of Plaintiffs' cases to the [BCNR] so [it] can, in light of the new guidance in the SOP, provide the second half of Plaintiffs' requested injunctive relief: a determination of their line-of-duty status and, if appropriate, reconsideration of their eligibility for disability benefits or medical retirement."  Navy's Mot. to Remand at 1–2.  Plaintiffs continue to refuse the offer, however, reframing it as an "attempt by Defendants to pick off the claims of the named representatives before the Court can rule on class certification."  Opp'n to Remand at 1.  They protest that the new SOP has not nullified the need for additional systemic relief because, in their eyes, "the SOP suffers from the same core defects as the Navy's previous practices . . . because the SOP (still) fails to require the Navy to consider the origin or aggravation of Reservists' disabilities prior to sending those Reservists through the MRR."  <u>Id.</u> at 4–5.

Urging the Court to reject this "pick off" attempt, Plaintiffs seek to move ahead with the certification of their putative class comprised of:

> All veterans of the United States Navy Reserve or Marine Corps Reserve who were separated or are currently pending separation from the military through the Navy's Medical Retention Review process as Not Physically Qualified without a Line of Duty Benefits Letter or a finding that they did not meet the eligibility criteria in

> Department of Defense Instruction 1332.18 for duty-related DES processing prior
> to their referral to the MRR Physical Evaluation Board.

Plaintiffs' Mot. for Class Cert. at 1.  The Navy opposes this request by echoing its assertions in

its own motion for voluntary remand that class certification is "unnecessary in this case" because

the Navy has already "addressed the key programmatic issue Plaintiffs complain of."  Opp'n to

Class Cert. at 1.  But beyond these practical considerations, the Navy insists Plaintiffs have failed

to satisfy Rule 23's requirements for class certification.  Id.  Most critically, the Navy maintains

that the proposed class definition is overbroad because it "includes many—perhaps hundreds

of—individuals whose illness or injury was not incurred in the line of duty" and are therefore not

"statutorily eligible for disability benefits regardless of whether they were provided with an

LODB determination."  Id.  Plaintiffs push back that this argument misconstrues their claim.

They disclaim any assertion that all purported class members' *substantive* rights were violated

because these Service members were entitled to medical benefits.  Rather, they contend that "the

injury to all Class members is the failure to provide a *procedural* process [for receiving the LOD

determinations] that is required by law" and insist this "failure harms all Class members

regardless of whether they would have received disability benefits if given the correct

procedure."  Plaintiffs' Reply at 7.

## II.   Legal Standards

Courts have "broad discretion to grant or deny an agency's motion to remand."  Util.

Solid Waste Activities Grp. v. EPA, 901 F.3d 414, 436 (D.C. Cir. 2018).  In exercising this

discretion, courts often consider "whether [the agency requesting the remand] has identified

substantial and legitimate concerns in support of a voluntary remand, and whether a voluntary

remand would conserve the Court's and the parties' time and resources, without causing undue

prejudice to [the plaintiffs]."  FBME Bank Ltd. v. Lew, 142 F. Supp. 3d 70, 73 (D.D.C. 2015)

(citations omitted).  Courts generally grant such motions so long as "the agency intends to take further action with respect to the original agency decision on review."  Limnia, Inc. v. U.S. Dep't of Energy, 857 F.3d 379, 386 (D.C. Cir. 2017) (emphasis removed).  Although the agency need not "confess error or impropriety in order to obtain a voluntary remand," it typically must at least "profess [an] intention to reconsider, re-review, or modify the original agency decision that is the subject of the legal challenge."  Id. at 387; see also Carpenters Indus. Council v. Salazar, 734 F. Supp. 2d 126, 132 (D.D.C. 2010) ("[C]ourts have long recognized the propriety of voluntarily remanding a challenged agency action without judicial consideration of the merits upon an admission of agency error.").

As to the motion for class certification, "[t]he party seeking certification bears the burden of persuasion, and must show that the putative classes meet the requirements of [Federal Rule of Civil Procedure] 23 by a preponderance of the evidence."  Garnett v. Zeilinger, 301 F. Supp. 3d 199, 204 (D.D.C. 2018).  Rule 23(a) establishes four threshold requirements for certification: "(1) numerosity, that 'the class is so numerous that joinder of all members is impracticable'; (2) commonality, that 'there are questions of law or fact common to the class'; (3) typicality, that 'the claims or defenses of the representative parties are typical of the claims or defenses of the class'; and (4) adequacy, that 'the representative parties will fairly and adequately protect the interests of the class.'"  Id. (quoting Fed. R. Civ. P. 23(a)).  In addition to meeting these four requirements, the moving party must also "choose a type of class action under Rule 23(b) and meet the requirements of that class type as well."  Attias v. CareFirst, Inc., 344 F.R.D. 38, 44 (D.D.C. 2023) (quoting Hoyte v. District of Columbia, 325 F.R.D. 485, 491 (D.D.C. 2017)).

### III. Analysis

The Court will grant the Navy's request for voluntary remand and deny Plaintiffs' motion for class certification without prejudice to renewal following remand.  The Court is persuaded that a voluntary remand is appropriate because it will provide Plaintiffs an opportunity to obtain the benefits that they seek sooner, rather than later, and might shed light on whether the Navy has successfully resolved some of the deficiencies in its prior DES processes.  The Court is cognizant of the potential pitfalls with remand when, as here, plaintiffs seek class certification in the hopes of obtaining programmatic relief.  It nonetheless finds that, on the facts of this case, the advantages of remand outweigh any drawbacks—especially considering the significant issues with Plaintiffs' proposed class definition.

Regarding class certification, Plaintiffs center their proposed class around an alleged procedural right to an actual determination on whether a Reservist's injury was incurred or aggravated in the line of duty.  A close parsing of the regulations does not reveal this asserted right.  Although the regulations may compel Navy officials to act appropriately when confronted with evidence that a Reservist was injured in active service to ensure she receives an LODB letter, they do not appear to require the Navy to investigate and make an LOD determination for each Reservist.  Without such a blanket procedural right applying to all 319 Reservists in the putative class who have been separated (or are pending separation) through the MRR process, Plaintiffs' proposed class flunks Rule 23 because it is significantly overbroad.

While Plaintiffs might be able to remedy these class issues through additional discovery, and thus the denial of the class-certification motion will be without prejudice, the Court believes the best course of action is to stay this case during the remand proceedings.  Any further action in this case would require additional rounds of briefing to resolve whether it is possible for

Plaintiffs to rework their class definition based on the Court's reading of the regulations.  It would also drag the parties into a dispute over whether it is possible to conduct the necessary class discovery here without infringing the privacy interests of potential class members.  The Court sees no good reason to charge full steam ahead into these thorny issues given that further litigation may prove unnecessary depending on the results of the remand and any ongoing discussions over a potential negotiated resolution that the parties seemed willing to undertake at the motions hearing.

A.  Voluntary Remand

Starting with the Navy's motion for voluntary remand, the Navy has demonstrated that remand is appropriate here because it will provide the Navy with a chance to correct its prior failure to review Plaintiffs' LOD status and offer Plaintiffs an opportunity to obtain the valuable benefits they seek without further delay.

As noted above, courts generally grant an agency's motion to remand if the agency has indicated that it intends to take additional action to reconsider and potentially modify its original decision.  See Limnia, 857 F.3d at 386; Friends of Animals v. Williams, 628 F. Supp. 3d 71, 76 (D.D.C. 2022) ("An agency need not confess that its decision was erroneous in order to obtain a remand; it must simply present a reason for reconsideration that is not frivolous or in bad faith.").  That is the case here.  Although the Navy has not admitted error, see Navy's Mot. to Remand at 2, it has recognized its "potential error in not providing Plaintiffs with LODB determinations in the first instance," id. at 11.  The Navy also has "acknowledge[d] that the new SOP provides a framework for the Navy to consider whether Plaintiffs were entitled to line-of-duty benefits determinations."  Id. at 2.  It thus proposes that the Court remand this matter to the BCNR "to allow the Navy to make, in the first instance, a decision regarding Plaintiffs' LODB status, and

to do so in light of the new standard operating procedure setting forth how sailors in MRR status—as Plaintiffs were—can seek an LODB determination and, if appropriate, be placed in the DES." Id. at 11. This certainly constitutes a "substantial and legitimate" reason to seek voluntary remand. FBME Bank Ltd., 142 F. Supp. at 73.

Plaintiffs' conjecture that this potential relief is illusory because nothing in the new SOP indicates that it has retroactive effect does not change this fact. Opp'n to Remand at 14. As the Navy explained in its briefing and during the hearing, see Navy's Reply at 16; Hearing Tr. at 13–14, whether the SOP technically has retroactive effect is not determinative because the BCNR's task remains the same: to "correct an error or remove an injustice." 10 U.S.C. § 1552(a)(1); 32 C.F.R. § 723.2(a). The BCNR therefore stands ready to correct any error in Plaintiffs' records and award them their appropriate benefits regardless of the SOP's applicability. But that does not mean that the SOP is entirely irrelevant either. Rather, the SOP demonstrates that the Navy has recognized the issue and taken strides to solve the problem. These efforts satisfy the Court that the Navy is committed to rectifying any past errors in the processing of Plaintiffs' cases on remand.

Relatedly, the Court sees no evidence that the Navy is operating in bad faith and no reason why remand would unduly prejudice Plaintiffs. See Limnia, 857 F.3d at 386. The Navy has identified a problem with its DES processes and is attempting to resolve the issue by redesigning its procedures and by reexamining the cases of Plaintiffs who were potentially wrongfully denied benefits under the old system. That makes this case a suitable candidate for voluntary remand given that courts generally "prefer[] to allow agencies to cure their own mistakes" when they express a desire for doing so. Ethyl Corp. v. Browner, 989 F.2d 522, 524 (D.C. Cir. 1993).

Plaintiffs see things differently.  They first point out that the Navy waited nearly seven months after Plaintiffs filed this case and the SOP went into effect to offer remand and contend that this delay renders the remand offer too little, too late.  See Opp'n to Remand at 11–13.  The Court disagrees.  It is not unusual for an agency to take some time before agreeing to a do-over, and courts oftentimes grant motions for voluntary remand filed many months after a lawsuit gets underway.  See, e.g., Carpenters Indus. Council, 734 F. Supp. 2d at 130–31, 134–35; Lohmann v. United States, 154 Fed. Cl. 355, 359–60 (2021).  The D.C. Circuit's decision in Lutheran Church-Missouri Synod v. FCC, 141 F.3d 344 (D.C. Cir. 1998), is not to the contrary.  There, the court found the agency's "novel, last second motion to remand" after oral argument was little more than a "legal tactic[] . . . to avoid judicial review."  Id. at 349.  But that decision in no way indicated that a multi-month lag in offering voluntary remand will doom such a request in less extreme cases where the remand request does not evince a bad-faith effort to dodge judicial oversight.  Here, nothing suggests that the Navy's offer to remand Plaintiffs' cases during a meet-and-confer one month after the Navy revised its new SOP (which it initially implemented prior to the filing of this lawsuit) and before any motion was pending before the Court was a similarly evasive maneuver.  Nor have Plaintiffs shown how this delay prejudiced them.  And even if slow walking the remand offer did prejudice Plaintiffs by preventing them from accessing benefits sooner, refusing that offer now would only compound the problem.

Plaintiffs maintain that this line of reasoning about their individual claims misses the mark because their primary objection to remand is it will interfere with their ability to proceed with their class action.  In particular, Plaintiffs express concerns that the Navy may be attempting to "pick off" the named representatives before the Court can rule on their class-certification motion.  See Opp'n to Remand at 7–11.  They raise alarms that permitting such a ruse would

"provide[] an end-run around the protections of Rule 23," id. at 10, and note that courts typically

fight back efforts to moot a named plaintiff's case in order to kill off the proposed class, see, e.g.,

Plunkett v. Castro, 67 F. Supp. 3d 1, 12 & n.6 (D.D.C. 2014) (holding that a "defendant may not

moot a motion for class certification by providing judgment to the named plaintiffs"); Wilson v.

Gordon, 822 F.3d 934, 947–49 (6th Cir. 2016) (collecting "pick off" cases). Such fears

regarding pick off are doubly misplaced here, however.

At the outset, the pick-off doctrine is an exception to claims of mootness rather than a

carve out to the standard rules regarding voluntary remand. See Kang v. Dep't of Homeland

Sec., 2022 WL 4446385, at *5 (D.D.C. Sept. 23, 2022). The Navy is not claiming that the

Plaintiffs' claims are moot, and remand would not eliminate their ability to seek class relief if

further litigation is necessary following the proceedings before the BCNR. The proper time to

raise this objection would therefore be if the Navy filed a Rule 12(b)(1) motion to dismiss after

those proceedings. But that is not the issue before the Court now. As a result, whether the pick-

off doctrine applies in this context (even in spirit) is largely beside the point.[1] Furthermore,

Plaintiffs contend that the pick-off doctrine's animating principle is to ensure plaintiffs are

"accorded a fair opportunity to show that certification is warranted." Campbell-Ewald Co. v.

Gomez, 577 U.S. 153, 165 (2016), as revised (Feb. 9, 2016). Even if this principle generally

suggests courts should be hesitant in granting voluntary remand in putative class actions seeking

programmatic relief, those considerations are inapt here because the Court is not remanding

Plaintiffs cases before they have had a fair opportunity to litigate their class-certification motion.

---

[1] Accordingly, other courts have granted motions for voluntary remand to a military board of records correction in putative class action suits. See Order, Monk v. Mabus, No. 14-cv-260, ECF No. 48 (D. Conn. Nov. 14, 2014); Lohmann, 154 Fed. Cl. at 360–61.

Rather, as detailed below, the Court finds remand is appropriate here in part because Plaintiffs have had their chance to litigate their class-certification motion but have failed to show that they can satisfy Rule 23—at least under the current class definition.  There is nothing unfair about remanding Plaintiffs cases to the Navy in this context.

Remand would also not harm judicial economy by putting off class resolution in favor of piecemeal relief, as Plaintiffs suggest.  See Opp'n to Remand at 13.  To the contrary:  It would be inefficient to afford Plaintiffs a second stab at class certification—which, for the reasons detailed below, would involve additional rounds of briefing and possibly complicated class discovery—when the Navy has offered Plaintiffs an opportunity to receive the benefits they seek.  Judicial economy also tilts in favor of remand in this case because it will provide the parties with an opportunity to observe how the BCNR handles Reservists who have already been separated and whether the Navy's new SOP works as intended for Reservists who are still working their way through the DES process.  This additional information, in turn, will aid the parties in ongoing negotiations in this matter, which may obviate the need for any further judicial involvement.

For these reasons, the Court will grant the Navy's motion for voluntary remand.  But to fully explain why this is the best route forward, the Court explores below why Plaintiffs' current class-certification motion falls short.

B.  Class Certification

The dispute over class certification here hinges on whether Reservists have a procedural right to an individualized LOD determination in the DES process.  Plaintiffs contend that three provisions in the Department of Defense's and the Navy's regulations create such a procedural right and specify that the determination must occur before the Navy refers a case to the PEB: (1) DoDI 1332.18, Appendix 1 to Enclosure 3, § 1; (2) DoDI 1332.18, Appendix 3 to Enclosure 3,

§ 6; and (3) SecNavInst 1770.5, Enclosure 1, § 3(i).  Under Plaintiffs' reading of these regulations, all 319 putative class members suffered the same system-wide violation of their procedural rights, regardless of whether they are ultimately entitled to benefits.  Additionally, they contend that the Navy's new SOP fails to resolve the core issue because it wrongly retains Reservists' burden to request an LODB letter and permits them to do so only after entering the non-duty MRR process.

The Navy takes the opposite view.  It maintains the regulations confer a substantive right to benefits for eligible Service members but create no procedural right to an LOD determination.  If a Reservist believes her current injury spawns from her prior deployment, the Navy insists it is the Reservists' onus to request an LODB letter because, in the absence of a letter, the controlling presumption is that the injury was not incurred or aggravated while on active duty.  Without a procedural right, the question becomes whether each Reservist was erroneously denied benefits despite meeting the statutory requirements—an individualized determination not suitable for class-wide resolution.

From the Court's reading of the regulations, reality lies somewhere in the middle of these two positions.  Plaintiffs appear to overread the three provisions on which they chiefly rely in an effort to create an ironclad obligation to investigate LOD status.  But it requires inferential leaps and contortions of the regulatory text to reach this result.  And, even then, the outcome is hard to square with the fact the regulations permit the Navy to rely on certain presumptions of eligibility for DES benefits.  But that does not imply that the regulations give the Navy carte blanche to funnel Reservists into the MRR process even when there are clear indicators their injuries stem from the line of duty.  Commanding Officers must respond reasonably to reported conditions to ensure eligible Reservists are referred into the proper DES channel.  In other words, higher ups

are not free to ignore warning signs that a Reservist's reported injury might have been incurred while in active status.

This procedural obligation, however, is far more supple than the rigid procedural right Plaintiffs advance. While the Navy appears to have violated this duty when it referred LaKia Beasley and Richard Henderson into the non-duty related path despite clear indications that their conditions directly resulted from their deployments to Afghanistan, it is doubtful that the Navy violated this duty for all 319 putative class members. Thus, even if its reasoning may be flawed, the Navy is correct in arguing that Plaintiffs class is overbroad. Without a clearer understanding of the class's proper scope, the Court cannot determine whether it satisfies Rule 23's numerosity requirement or whether Plaintiffs' experiences are typical of the Reservists they seek to represent. The Court therefore cannot certify the putative class at this point. Moreover, while class discovery could resolve some of these issues, discovery might prove challenging in this area given the significant privacy interests at play. And, even if discovery can proceed, it is uncertain whether it would save the class here because it is unclear whether class-wide legal issues will predominate case-specific factual questions. Rather than plunge headfirst into these murky waters, the Court will deny the class-certification motion without prejudice to renewal after remand proceedings.

### 1. Plaintiffs' Claimed Procedural Right

Plaintiffs point to three regulations—(1) DoDI 1332.18, Appendix 1 to Enclosure 3, § 1; (2) DoDI 1332.18, Appendix 3 to Enclosure 3, § 6; and (3) SecNavInst 1770.5, Enclosure 1, § 3(i)—as evidence that the Navy must investigate the causes of a Reservist's condition before referring her to the non-duty related MRR process. Upon close inspection, however, this trio of regulations does not create a blanket procedural right to an LOD determination in every case.

The first provision that Plaintiffs identify is DoDI 1332.18, Appendix 1 to Enclosure 3, § 1.  This provision directs the "Secretary of the Military Department concerned [to] refer [into the DES Service] members who meet the criteria for disability evaluation regardless of eligibility for disability compensation."  The next section termed "Criteria for Referral" specifies the medical requirements for referral into the DES and reiterates that military officials must refer members into the system whenever these conditions are satisfied.  Id. § 2(a).  The Instruction then describes the "Eligibility for Referral" into the two different DES paths.  Id. § 3.  Under the banner "Duty-[R]elated Determinations," it states that, "[e]xcept as provided in section 4 of this appendix, the following categories of Service members who meet the criteria in section 2 of this appendix are eligible for referral to the DES for duty-related determinations"—listing Service members on duty for more than 30 days and "RC members who are not on orders to active duty specifying a period of more than 30 days but who incurred or aggravated a medical condition while the member was ordered to active duty for more than 30 days."  Id. § 3(a).  The Instruction then defines a residual group of "Non-[D]uty Related Determinations" when explaining that "[m]embers the RC with non-duty related determinations, who are otherwise eligible as described in section 2 of this appendix, will be referred solely for a fitness for duty determination when one of the following [three conditions] exist."  Id. § 3(b).  As relevant here, the first of these conditions is that "the RC member does not qualify under paragraph 3.a. of this appendix."  Id. § 3(b)(1).

Plaintiffs read the mandatory language that "the Secretary of the Military Department concerned *will* refer Service members who meet the criteria for disability evaluation" to mean that each branch "is *required* to refer all eligible Service members into the duty-related path of the DES."  See Plaintiffs' Mot. for Class Cert. at 5–6.  To satisfy that obligation, Plaintiffs

contend that the Navy must determine whether a Service member incurred his or her injuries in the line of duty and is therefore eligible for the duty-related pathway.  See id.  That interpretation places more weight on these words than they can bear, however.  This provision mandates that the Secretary of the Navy refer members "who meet the criteria for disability evaluation *regardless of eligibility for disability compensation*."  The mandatory language is thus used in reference to the medical criteria for separation or retirement specified in § 2, not LOD criteria in § 3 specifying eligibility for the duty-related path.  In other words, the regulation directs the Secretary of the Navy to refer members to the DES when the medical conditions are satisfied.  It does not mandate any processes that the Secretary must follow to ensure members are referred into the proper channel depending on whether their injuries were duty related.  Plaintiffs attempt to elide that issue by insisting that Service members who are eligible for the "duty-related" pathway are inherently ineligible for the "non-duty related pathway," and thus a Secretary can fulfill her obligation only by screening for LOD status.  See id. at 6.  But that argument rests on a significant inferential leap that cannot be supported considering that the second provision of DoDI 1332.18 on which Plaintiffs rely makes clear an investigation into LOD status is *not* in fact required in every case.[2]

    This second provision—DoDI 1332.18, Appendix 3 to Enclosure 3, § 6—describes the "standards for determining compensable disabilities" by detailing the requirements for "LOD determinations," which the Instruction defines as an "inquiry to determine whether an injury or illness was incurred [or aggravated] when the Service member was in a military duty status . . .

---

[2]  For similar reasons, Plaintiffs' citation to DoDI 1241.01 § 3(c)'s statement that an "RC member will be referred to the DES when the criteria for referral are met in accordance with DoDI 1332.18" also does not create a procedural right because this cross-reference does not specify the procedures for sorting between the two pathways.  See Compl. ¶ 108.

or whether it was incurred or aggravated due to the Service member's intentional misconduct or willful negligence." <u>Id.</u>, Glossary, Part II.  The provision first notes that "LOD determinations will be made in accordance with the regulations of the respective Military Department.  When an LOD determination is required, the DES will consider the finding made for those issues mutually applicable to LOD and DES determinations." <u>Id.</u>, App. 3 to Enclosure 3, § 6(a)(1).  It further specifies that "[w]hen an LOD determination is required, it will be done before sending a Service member's case to the PEB." <u>Id.</u> § 6(b).  Following up on this directive, the provision outlines a non-exhaustive list of required determinations:

> <u>Required Determinations</u>.  At a minimum, LOD determinations will be required in these circumstances[:] (1) Injury, disease, or medical condition that may be due to the Service member's intentional misconduct or willful negligence, such as a motor vehicle accident[;] (2) Injury involving the abuse of alcohol or other drugs[;] (3) Self-inflicted injury[;] (4) Injury or disease possibly incurred during a period of unauthorized absence[;] (5) Injury or disease apparently incurred during a course of conduct for which charges have been preferred[; and] (6) Injury, illness, or disease of RC members on orders specifying a period of active duty of 30 days or less while [performing a specified set of duties].

<u>Id.</u> § 6(d).  Conversely, the provision also lists "Presumptive Determinations" in which an LOD investigation is not necessary because the "determination is presumed to be in the LOD." <u>Id.</u> § 6(c).  The Instruction goes on to state that the "Secretaries of the Military Departments will presume that diseases or injuries incurred by Service members on continuous orders to active duty specifying a period of more than 30 days were incurred or aggravated in the LOD unless the disease or injury was noted at the time of entry into service" or the presumption is rebutted by "clear and unmistakable evidence." <u>Id.</u> § 7(c)(1).  By contrast, "[t]here is no presumption of incurrence or aggravation in the LOD for RC Service members serving on orders of 30 days or less." <u>Id.</u> § 7(d)(3).

Plaintiffs home in on the language requiring that the military departments complete LOD determinations *before* sending cases to the PEB.  They contend that Navy officials violated this procedural requirement in their cases because they never conducted an LOD investigation and that the Navy continues to violate this requirement even under the new SOP because it only creates an opportunity to receive an LOD determination *after* a Reservist has entered the MRR process.  Plaintiffs' Mot. for Class Cert. at 12.  But, the Navy points out, this provision lists specific circumstances where "LOD determinations are . . . required," and none of those apply in the cases at issue here.  Opp'n to Class Cert. at 5.  Indeed, the Navy contends that the absence of "Reservist status" from the list of "Required Determinations" is affirmative evidence that Navy officials are not required to investigate the sources of Reservists' injuries.  See id.; Hearing Tr. at 43.

Once again, Plaintiffs' arguments are unconvincing.  The Navy may overstep here given the regulation states, "*[a]t a minimum*, LOD determinations will be required in [the enumerated] circumstances."  LOD determinations thus may be required in circumstances that are not listed.  Nonetheless, the repeated references to "when an LOD determination is required" combined with the specific enumeration of required determinations makes clear that an investigation is not required in every instance.  In many cases, whether a Service member is referred into the duty-related pipeline will turn on a controlling presumption.  When a Service member suffers an injury on active duty for more than 30 days, for example, her case typically will be controlled by a presumption that the injury was incurred in the line of duty.  Nothing in the regulation rules out the possibility of the inverse presumption that a Reservist who reports an injury while she is not on active duty did not suffer the injury in the line of duty unless she proves otherwise.

The broader regulatory context also casts doubt on Plaintiffs' argument that the new SOP is deficient because "DoDI 1332.18 makes clear that if the Navy is going to require an LOD determination for DES referral, the determination must occur *before* the Service member goes to a PEB." Plaintiffs' Mot. for Class Cert. at 12. Plaintiffs complain that, even under the new SOP, Reservists who are referred to the non-duty MRR process do not receive an LOD determination prior to appealing the BUMED's medical determination to the PEB. But this provision of DoDI 1332.18 appears to apply to the process for a case that is moving through the duty-related DES channel, going first to the MEB for a medical assessment and then to the PEB for an allocation of benefits. Within that pipeline, an LOD determination must be completed before the case gets to the PEB because the PEB needs that assessment in order to allocate benefits. The enumerated list of required determinations further supports this reading. In each of the listed cases, without an in-LOD determination indicating that the Service member did not suffer an injury while in the line of duty, the controlling presumption would entitle that member to retirement benefits. The purpose of requiring that the PEB have the LOD determination in hand thus appears to be culling back benefits from otherwise eligible recipients. Given this purpose, the provision would appear to shed little light on the timing of LOD determinations for non-active Reservists placed into the non-duty path. This is especially true considering DoDI 1332.18 focuses on the DES process "for all newly initiated cases referred under the duty-related process," DoDI 1332.18, Enclosure 3, § 1(b)(1), leaving the rules governing the non-duty related path largely undefined.

The third and final provision that Plaintiffs focus on is SecNavInst 1770.5, Enclosure 1, § 3(i), which describes the DES obligations of the Chief of Naval Operations ("CNO") and the Commandant of the Marine Corps ("CMC"). Section 3 begins by explaining the "CNO and the CMC are the [Benefit Issuing Authorities ('BIAs')] for their respective service and responsible

for efficient, effective case management and disposition of RC Service Members who incur or aggravate an illness, injury, or disease that qualifies for benefits under this instruction." Id. § 3. As the BIAs, the CNO and CMC "coordinate healthcare for RC members for an injury, illness, or disease incurred or aggravated in the line of duty" and "administer the in-LOD benefits and Incapacitation Pay programs." Id. Section 3(i) instructs the CNO and CMC to:

> Direct in-LOD determination cases to the Integrated Disability Evaluation System (IDES) for conditions that may be permanent because the nature and degree of the condition may render the member unable to continue naval service within a reasonable period of time per references (h) and (j). Ensure all cases referred to the Physical Evaluation Board (PEB) contain complete in-LOD documentation regardless of whether illness, injury, or disease incurred either on or off-duty.

Id. § 3(i).

Plaintiffs read this requirement that "all cases referred to the [PEB] contain complete in-LOD documentation" as connecting with DoDI 1332.18's corresponding instructions to require that Navy officials make an LOD determination before a case gets to the PEB. See Plaintiffs' Mot. for Class Cert. at 7–8 (citation omitted). The Navy retorts that, as was the case with the analogous DoDI 1332.18 provision, this requirement is inapplicable because it pertains only to instances in which a case in the duty-related DES pipeline is referred from the MEB to the PEB. See Navy's Reply at 19 ("Naval regulations require 'complete in-LOD documentation' only where a sailor enters the DES via the duty-related path[.]"). The Navy once again has the better of the argument.

For starters, there is ample reason to believe the requirement for LOD documentation is reserved for cases proceeding through the duty-related DES pathway from the MEB to the PEB because those are the only instances in which the PEB needs LOD paperwork in hand to allocate benefits. When a case instead gets to the PEB through the non-duty pathway via an appeal of the BUMED's medical determination, the PEB sits as an appellate panel reviewing only the fitness

determination.  It does not assess LOD status in this appeal, as the named Plaintiffs learned when the PEB refused to consider LOD evidence during their appeals and insisted that the matter was beyond its scope of review.  <u>See</u> AR at 4; Compl. ¶¶ 90–92.  SecNav M-1850.1—the regulation dedicated to the DES process—reinforces this point when describing the PEB stage as reviewing a DES casefile referred from the MEB for an allocation of benefits, which is markedly different from the role the PEB plays when it sits as an appellate body in review of the BUMED's medical determinations in the non-duty MRR process.  <u>See</u> SecNav M-1850.1, Ch. 1, § 2(c).  This DES Manual directs, "[b]efore referring a case for PEB review, the MEB Convening Authority shall review case records to ensure they contain required LOD/M determinations from the responsible command."  <u>Id.</u>, Ch. 3, § 6(e).  Here, the regulation contemplates that when LOD documentation is required—an important caveat that the Court will take up below—the MEB must ensure that it is completed before forwarding a case to the PEB.  It is most natural to read SecNavInst 1770.5's analogous requirement as applying to the same set of cases, not to the separate category of non-duty related cases in the MRR process.

This commonsense cabining finds some textual support.  The provision at issue here applies to "in-LOD determination cases."  SecNavInst 1770.5 defines "in-LOD determination" as an "authorization of health care benefits," which takes place in the duty-related DES process, not the non-duty related MRR process.  SecNavInst 1770.5, Enclosure 3, § 16.  At the same time, however, some other textual clues point in the opposite direction.  This provision uses expansive language, directing that "*all* cases" include "complete in-LOD documentation *regardless of whether illness, injury, or disease [was] incurred either on or off-duty*."  Viewed in a vacuum, then, this broad language could suggest that the provision refers to a wider universe of cases that might sweep within its ambit cases appealed from the MRR process.

But the Court cannot read one provision in isolation, as the overall scheme here undercuts Plaintiffs' reading of the undefined term "complete in-LOD documentation" as requiring that the Navy conduct an LOD investigation in every case that reaches the PEB.  After all, DoDI 1332.18 and corresponding Navy regulations clearly contemplate that an investigation is *not* required in the mine-run of cases that are controlled by presumptions.  For example, there will be little (if any) "in-LOD documentation" for cases where a Service member was injured while on active duty for more than 30 days and the case does not fall within one of the "required determination" categories because the in-LOD presumption controls.  By the same token, nothing precludes the possibility that there will similarly be no in-LOD documentation for most non-active Reservists' cases if they are governed by a contrary presumption that their injury did not arise in the line of duty.  From this perspective, the requirement that the CNO and CMS must ensure that a case file has complete in-LOD documentation before going to the PEB is not an elephant in a mousehole that creates a new procedural right to an LOD investigation in every single case.  See Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 468 (2001) (describing the no "elephants in mouseholes" canon).  It is instead a simple requirement for these DES case managers to ensure that whatever LOD documentation exists is forwarded to the PEB.

This interpretation jibes with other on-point Navy regulations.  The Navy's DES Manual describes the various stages of the DES process.  The Manual states that the PEB should review "LOD/M determinations, *when appropriate*" and "LOD Benefits Letters for Reservists, *when appropriate*."  SecNav M-1850.1, Ch. 1, § 2(c)(1)(b), (h) (emphasis added).  It also requires so-called "PEBLOs," who assist Service members throughout the DES process, obtain "the LOD investigation and determination with all supporting documentation, *when required*, from the Service Member's command."  Id. § 5(d)(13) (emphasis added).  PEBLOs also consult with the

member's chain of command, which "provides a Non-Medical Assessment of duty performance and LOD determination, *when necessary*," id. § 7(c)(3) (emphasis added).  Repeated references to LOD documentation "when required," "when appropriate," or "when necessary" drives home the point that a requirement for "complete in-LOD documentation" does not imply there must be an investigation into LOD status in every case before it goes before the PEB.  See also id., Ch. 3, § 4(g)(1) ("*When a determination is required*, the MEB will consider the findings made for those issues mutually applicable to the LOD and DES referral determinations." (emphasis added)).

Taking stock, none of the three regulations on which Plaintiffs rely create the blanket procedural right to a DES investigation that they claim the Navy violated for all purported class members.  Even when the Court views these three regulations in unison, rather than in isolation, it fails to see anything in the regulations indicating the Navy must conduct an LOD investigation in every case.  In fact, a plain reading of the regulations shows the opposite given that the Navy may rely on certain presumptions when sorting Service members between the duty-related and non-duty related DES paths.  Nor can the interpretative canon that "provisions for benefits to members of the Armed Services are to be construed in the beneficiaries' favor" save Plaintiffs' claims.  Henderson ex rel. Henderson v. Shinseki, 562 U.S. 428, 441 (2011) (citation omitted).  This pro-veteran canon puts a thumb on the scale in Service members' favor when, after exhausting the ordinary tools of interpretation, things stand in equipoise.  See generally Kisor v. McDonough, 995 F.3d 1347, 1348–58 (Fed. Cir. 2021) (en banc) (Prost, C.J., concurring) (overviewing the pro-veteran canon's proper role).  It cannot craft a procedural right that is unsupported by the regulatory text.

But none of this means that Navy officials have *no* obligation to ensure eligible Service members are referred into the proper DES channel and receive the benefits that they are owed.

Although the LOD determination process is not as structured as Plaintiffs suggest, there are still some procedural requirements that, on the named Plaintiffs' allegations, the Navy likely violated in their (and potentially other putative class members') cases.

### 2. An Alternative Procedural Right

Peeling back the curtain to reveal a larger ensemble of regulations beyond those Plaintiffs spotlight, the Court finds that Navy officials do in fact have *some* duty to respond to Reservists' reported injuries and inquire into their causes to determine if the Service member is eligible for DES benefits. The question becomes whether this more nuanced procedural right is susceptible to class-wide resolution—a complicated issue that the Court need not definitively resolve at this juncture.

As noted above, DoDI 1332.18 specifies the processes and presumptions that apply to active Service members as well as Reservists who are deployed for more than 30 days. Yet it pays almost no attention to how non-active Reservists navigate their way through the DES. For more detail on the rules governing this group of Service members at the center of this case, one must look to a different regulation: DoDI 1241.01. Although the parties pay it scant attention, DoDI 1241.01 is the regulation that directly addresses medical benefits for Reservists, covering a wide array of benefits, including separation and retirement benefits. The regulation begins by noting an "in-LOD determination" is a "prerequisite" for treatment and benefits. DoDI 1241.01 § 3(a)(3). It then details the procedures for the "initiation of in-LOD determination" by stating that "[u]nless already initiated by a member's command, the RC Service member . . . will initiate the request for an in-LOD determination." Id., Enclosure 3, § 2(a)(1). This directive to request an LOD determination once more refutes Plaintiffs' categorical claim that sailors never bear the burden of seeking an in-LOD determination because this onus lies exclusively with the Navy.

See Plaintiffs' Mot. for Class Cert. at 1 (arguing the burden "rest[s] squarely with the military, *not* the Service member").  But the regulation does not suggest that military departments should be passive players in this process.  It instead specifies that a Service member should make the request "[u]nless already initiated by a member's command."  Thus, the regulation envisions a process in which a Reservist is in dialogue with her higher ups and either side can call for an LOD determination when necessary.  For further detail on how that conversation plays out, one must turn to the Navy's own regulations on the matter.

Beyond reciting responsibilities of the CNO and CMS, SecNavInst 1770.5 also describes the duties of Commanding Officers and rank-and-file Reservists.  For Commanding Officers, the regulation states that "[t]he RC Service Member's chain of command shall ensure expeditious medical treatment and proper case management.  The command shall ensure counseling on the rights and benefits to which the Service Member is entitled, is provided."  SecNavInst 1770.5, Enclosure 1, § 11.  SecNavInst 1770.5 then liquidates this general duty with specific directives. It first states:  "When a Service member reports an injury incurred or aggravated during a period of duty or while in a covered travel status, an LODI"—which is defined as "[a]n investigation to document the official record of the circumstances surrounding an injury, illness, or disease incurred or aggravated on active or inactive duty which may require healthcare subject to an in-LOD Determination decision," id., Enclosure 3, § 17—"will be conducted, to document the occurrence and establish the Service Member's basis for eligibility."  Id., Enclosure 1, § 11(a). The regulation then instructs that "[w]hen a Service Member reports an injury not incurred or aggravated during a period of authorized duty or when not in a covered travel status, but the injury impacts the member's ability to perform military duties, the command shall conduct proper screening of records to ensure the injury is not related to a previously reported injury

incurred in-LOD." Id. § 11(b).  For Commanding Officers to serve this role, Service members must play their part by reporting "any injury, illness, or disease incurred or aggravated during a period of duty as soon as possible via the chain of command after occurrence." Id. § 12(a).  In doing so, sailors must "[p]rovide the chain of command all applicable information to complete an LODI." Id. § 12(b).

Here, the envisioned back-and-forth dialogue comes into focus.  The regulation notably does not require that Commanding Officers conduct an LODI whenever a non-active Reservist reports an injury, as it appears to mandate for active-duty members. See Antonin Scalia & Bryan Garner, Reading Law: The Interpretation of Legal Texts 170 (2012) (noting that courts should pay attention to meaningful variation).  It instead creates interlocking obligations for Reservists and their Commanding Officers:  Reservists must come forward with all relevant information about their injuries, and Commanding Officers must use that information to make an in-LOD determination when appropriate.  It is through this back and forth that the regulations ensure Reservists are placed into the proper DES channel.  Thus, even if Commanding Officers do not have an affirmative duty to conduct an LOD investigation in every case, these higher ups in the Navy must respond appropriately to reported injuries to ensure that Reservists receive an LOD determination when suitable.

Commanding Officers appear to have shirked this obligation when processing the two named Plaintiffs.  One quick glance at Richard Henderson's file would have revealed that his injury likely stemmed from his deployment in Afghanistan, where he was airlifted from the line of duty for medical treatment and underwent surgeries through a MEDHOLD program available only to those injured in the line of duty.  The same is true for LaKia Beasley, who was treated for PTSD before her active enlistment ended and eventually separated for that same condition.  For

some reason, however, their Commanding Officers failed to procure an LODB letter. Beasley and Henderson were accordingly placed into the non-duty related MRR pathway with no chance of receiving the benefits to which they were (allegedly) entitled. If their cases are representative of other Reservists' experiences, then there could well be a systemic violation of procedural rights—one that the new SOP would not resolve by allowing individuals who have already been wrongly placed into MRR to request a transfer into the duty-related pathway.

But a systemic violation of this more nuanced procedural right likely would not save Plaintiffs' proposed class. The actual procedural violation here, unlike the one Plaintiffs advance, is not a universal violation that will apply to all 319 putative class members who have been or are in the process of being separated from the Navy without a formal LOD investigation. Rather, the violation is more subtle: It is a failure on the part of Commanding Officers to act appropriately when confronted with evidence that a Reservist was injured in the line of duty to ensure eligible Reservists receive an LODB letter and proceed through the duty-related process. So defined, it is highly unlikely that every member of the putative class suffered a violation of her procedural rights. For example, Commanding Officers would have little obligation to investigate further in the hypothetical case of the Reservist who reports she injured her back not while in the line of duty but while working as a civilian managing inventory in her job at Costco. Such an individual should therefore not fall within the aggrieved class because she did not endure any intrusion upon her rights. At this stage, the Court has no idea how many of the 319 identified Reservist's cases resemble those of the two named Plaintiffs or just how many are cut from the same cloth as the hypothetical Costco employee. It could be a large number that had their rights violated; or it could be limited to the handful of individuals whom Plaintiffs have identified. See Plaintiffs' Mot. for Class Cert., Ex. 5 (Hurst Decl.); id., Ex. 6 (Fulkerson Decl.);

id., Ex. 7 (Ganaban Decl.).  The problem is that the Court is currently in the dark and that there is

no way for it to determine whether the class is so numerous that joinder would be impracticable

or whether Ms. Beasley and Mr. Henderson are representative of the class they seek to represent.

The fact that the Court is left guessing on these central matters proves that Plaintiffs have not

met their burden of showing by a preponderance of the evidence that they satisfy all Rule 23

requirements.  See Garnett, 301 F. Supp. 3d at 204.  For that reason, the Court must deny

Plaintiffs' motion.

 That dismissal will be without prejudice, however, as Plaintiffs have not yet had an

opportunity to brief this matter and have raised the prospect that limited discovery could alleviate

any concerns about the putative class.  See Plaintiffs' Mot. for Class Cert. at 24–25.  Class

discovery, for example, could reveal how many Reservists suffered similar procedural violations

at the hands of Commanding Officers who ignored clear warning signs that their conditions were

incurred or aggravated in the line of duty.  And contrary to what the Navy suggests, see Opp'n to

Class Cert. at 32 & n.11, the Court finds no authority indicating that class discovery is

inappropriate here because review in APA cases is typically limited to the administrative record.

In fact, courts routinely permit discovery in APA cases for discrete matters that are unrelated to

why the agency took an action in a particular case.  See, e.g., Manker v. Spencer, No. 3:18-cv-

372 (CSH), 2019 WL 5846828, at *19 (D. Conn. Nov. 7, 2019) (rejecting a similar argument).

 With that said, the Court has significant concerns about the ability of future discovery to

cure the current deficiencies in the proposed class.  This more nuanced procedural right defined

by whether a Commanding Officer acted reasonably when confronted with a reported injury may

not be susceptible to class-wide resolution.  Reasonableness will likely depend on the facts of

each Reservist's case, as it will turn on whether her Commanding Officer ignored evidence in

her file suggesting that she was in fact injured on active duty.  As a result, whether a Reservist suffered a *procedural* injury will overlap with whether the Reservist suffered a *substantive* violation by being denied her statutorily entitled benefits—a question Plaintiffs tacitly admit turns on individual rather than class-wide facts.  It is thus possible that no amount of discovery can save Plaintiffs' motion because deciding who falls within the class would "entail[] a fact-specific inquiry to be made on a case-by-case basis."  Daskalea v. Wash. Humane Soc'y, 275 F.R.D. 346, 362–63 (D.D.C. 2011) (citation omitted).  And even if Plaintiffs theoretically could overcome this barrier, it is not obvious how Plaintiffs could conduct class discovery here given that the materials they would seek to uncover are primarily medical records and personnel files protected under the Privacy Act.  See Laxalt v. McClatchy, 809 F.2d 885, 889 (D.C. Cir. 1987) (noting the difficulties with discovery where the records sought are subject to the Privacy Act).

The Court need not resolve these vexing matters right now, however, as it will stay this case pending resolution of the Plaintiffs' remand.  Issuing a stay here will provide the parties an opportunity to observe how the Navy's new SOP operates in practice and therefore will inform Plaintiffs' decision of whether to renew their motion for class certification.  Additionally, the stay will hopefully provide the parties with more time to hammer out an agreement that resolves the remaining issues with the DES referral process, perhaps informed by the views expressed in this opinion, without the need for further litigation.

## IV.  Conclusion

For these reasons, it is hereby

**ORDERED** that [Dkt. No. 28] Plaintiffs' Motion for Class Certification and Appointment of Class Counsel is DENIED without prejudice.  It is further

**ORDERED** that [Dkt. No. 30] Defendants' Motion for Voluntary Remand is GRANTED.  It is further

**ORDERED** that this case is STAYED pending resolution of the remand.  It is further

**ORDERED** that the parties file a joint status report within 14 days of the resolution of Plaintiffs' cases on remand.  The report shall include a discussion of the need for further proceedings.

**SO ORDERED**.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date: September 28, 2023